5054, Koehn v. Secretary of Health and Human Services. Okay, you may proceed. Ms. O'Dell? Yes. Good morning, Your Honors. May it please the Court. My name is Lee O'Dell. I'm here on behalf of Cheryl Koehn, the mother of Vanessia Koehn. And Vanessa Koehn's injury was the onset of systemic juvenile idiopathic arthritis after vaccination with a Gardasil vaccine. And specifically, we are urging... One of the issues that you have to overcome is the specificity of the disease. And so, I think it's important for us to understand that there was a special master's determination that there wasn't established by preponderance of the evidence of medical causation theory, Alfen Prong One. And in particular, what he seemed to focus on was Dr. McCabe's opinion that the Gardasil alone, as opposed to Gardasil and exposure to an antigen, the Gardasil alone can cause an increase in cytokines. That seems to be where he found no support for Dr. McCabe's opinion. And that's why he concluded that it didn't establish a reliable theory of medical causation. Do you address why you think that was incorrect? Yes. And you're referring to the Pinto article, I assume, Your Honor. And... Well, that's what Dr. McCabe relied upon, right? Correct. He didn't rely upon any studies that he had done or any independent knowledge of the field or anything in his medical practice or anything like that. He relied upon the Pinto article as establishing the increase in cytokines with exposure. That's correct. And let me just clarify something. He relied on his training and experience in the measurement of cytokines. But in terms of the Pinto article, what Pinto was designed to do was to measure the increase in cytokines, and the ones that are particularly relevant in this circumstance are interleukin 1, interleukin 6, and TNF-alpha, and to measure the increase in cytokines post-vaccination. And in the Pinto experiment, you have whole blood cells that are withdrawn from the 20... There are 24, actually, but 20 women in the study. And then you put them in assays, and the comparator is from placebo versus vaccination. And then you look at the vaccinated group, and you say the median group versus those who got 1 microgram or 10 micrograms. And what Dr. McKay testified, and we believe and assert that Special Master Moran just completely disregarded, is that in order to measure cytokine production at that point, the cells have to be stimulated. The media is essentially the comparator to the stimulated cells because those cells have been brought out of the body. They're ex vivo. And so the purpose of the experiment required that the cells be stimulated. And specifically, if you'll look, and Dr. McKay discussed this at a... Maybe I'm wrong, but my recollection was that Pinto measured whether or not there was an increase in cytokines simply by virtue of the vaccine, and found no, but there wasn't. And then there was a separate analysis that indicated that when there was exposure to the vaccine and the antigen, the HPV antigen, that then there was, in fact, an increase in cytokines. Well, the point is there would not be, outside the body, in those assays, there would not be an increase in cytokines measured without there being some stimulant.  But then why did Dr. McKay rely on Pinto if it didn't... Because it doesn't establish that exposure to the vaccine alone increased cytokines. It does not establish that. And so given that it doesn't establish that, why was that what he relied upon as the basis for his opinion that it did, in fact, cause an increase in cytokines? His viewpoint of the experiment was, in fact, that it did show an increase in cytokines post-vaccination because cytokines were measured at 0, 2, and 7, I believe, after the vaccination. So the very purpose of the Pinto study was to measure the cytokines post-vaccination at essentially the three-dose regimen that is a part of the Gardasil program. And so, but the cytokines would not be measurable outside the body in assays without there being a stimulant. Right, and isn't that what Dr. Rose's point was, that any time you stimulate an antigen, it's going to increase cytokines? So what are we really showing here? Well, the purpose was to measure the relevant cytokines at the point of vaccination, but that can't be done in the body. So it has to be, the blood has to be withdrawn, and in order to replicate what's going on in the body, there has to be a stimulant that's put into the assay. That's how Dr. McCabe explained the article. And so the conclusion of Pinto that they come to says that you would essentially, in a functioning immune system, there would only be a upregulation of cytokines if those cells are told to do so. Even if we agree with you with respect to all from PROM-1, and I can see there are a lot of oddities in the special master's analysis of PROM-1, when you get to PROM-2 and PROM-3, I think there are some additional problems, especially given our standard of review. I mean, isn't it true that Dr. McCabe said there are almost too many variables to say what exactly caused this injury? He does say that, but I do believe the precedent is that just because there are other things that could have caused it doesn't mean that the medical theory that's being posed is not... Right, but medical theory is one thing. So assuming you get past PROM-1 because you've shown a viable medical theory, that you still have to show causation. And I understand that at some point your causation showing doesn't have to be extreme under this theory because you can shift to the government and it's disproved, but there still has to be something really tying the two together. It seems that Dr. McCabe is simply saying there's all kinds of variables, but ultimately I think that probably did it. I mean, is that enough? Or isn't it fair for the special master to conclude that's not enough? I think the evidence shows that it's more than that because in terms of specific causation, PROM-2, if you look at Vanessa's specific circumstance, she had been vaccinated twice. She was in that process of seroconversion. So in other words, I think what Pinto shows is that you have this upregulation of cytokines during that period. If you look at the Fraser article, the Stanley article, you'll see that that's the point of the three doses of the vaccination. So she is in that period, and in that period she manifests clinical symptoms that show upregulation of cytokines, specifically the ones implicated in SJA. And those would be rash, fever, joint pain. But what's the impact of the fact that her symptoms didn't worsen after the third dose? In that specific instance, she was on medication that would have hampered her symptoms at that point. So she was on Enbrel, she was on methotrexate. So you would not expect to see the same upregulation of cytokines, the same symptoms, because she's on the very medications that are suppressing TNF-alpha, for example, and interleukin-1. And so for her, she did have a flare, the evidence shows. She did go to physical therapy, and the physical therapy records show she has a flare. But is it to the degree? No. And the reason is because of the medication she's on at that time. Now in terms of temporal association, And I'll go back to the time period necessary for seroconversion under Gardasil, which the literature that was put in the record, and I've mentioned it, Stanley Fraser, showed seven months. Dr. McCabe testified that you would expect the appropriate temporal association to be within zero to seven months. In Vanessa's situation, she had an onset of symptoms within two and a half months of the second vaccination. So we assert that that is evidence of temporal association. The other points raised, and Your Honor, did I address your question there on time period? So before you go on, what's the basis for the seven-month window? The basis for the seven-month window is that is the time frame necessary, according to the scientific literature, for there to be seroconversion or immunogenicity after Gardasil vaccination. In other words, they have a three-dose regimen for a purpose, and that is that immunity from those four strains of HPV, 6, 11, 16, and 18, only occur after seven months. But why does the seven-month immunity window necessarily tie to the window of injury causation relating to the cytokine uptick? Because the cytokines go up very quickly after the injection, correct? They do, and then it continues on. And so what you expect is you would have what's called amplification. As I mentioned, Dr. McKay testified the amplification process during the three-shot regimen. So that process is ongoing during the time frame of the vaccination. And so that period, two-and-a-half months, is still well within the temporal association time period because the amplification process is ongoing. I guess I don't understand that part. Can you explain it? What do you mean amplification is ongoing? The literature shows the cytokines go up quickly after exposure. That is correct. But what you're having is you're in the amplification process, and I would direct the court's attention to Dr. McKay's testimony at A146 through 147 and page 232. But in terms of amplification, what's happening is that once that process of seroconversion, it starts at the point of vaccination or the first, second, or third, first vaccination, but it continues on, and that amplification process or that... Well, I thought that, as I understood it, it was each vaccination amplifies the potential impact, but I guess I didn't follow it as suggesting that there could be a long time lag after one of the vaccinations, and during that time lag there was additional amplification even though the vaccine was administered. I'm not following that. And if you can explain it. Your Honor, I appreciate Dr. McKay's testimony. Once you are vaccinated, that process begins. You are vaccinated again for one month or two months, in Vanessa's case, and it's a process that builds on itself. It's not a process after vaccination. The cytokines drop off immediately after vaccination, and they don't activate again until the next shot. As I appreciate it, the immune response continues to build post-shot. But didn't Dr. McKay admit that there were tests that could be done to determine whether or not this amplification process actually occurred in Vanessa, and that he admitted that they weren't done? I think his testimony was that they were not done, but that in a clinical setting they are never done. They're really isolated to a laboratory setting. So he conceded he didn't actually have any hard evidence for his amplification process theory. The only evidence in the record for Vanessa experiencing amplification would be what her clinical symptoms were at the time of her diagnosis in July of 2008, and that would be her SED rate, her white blood cell count, her fever, joint pain, et cetera. We should save a little bit of your time for rebuttal. Let's hear from the government. Mr. Wishart. May it please the Court and Counsel. In this case, as you know, the appellants proposed a two-part theory of vaccine causation for PRONG1 evolving, the first part being whether an increased pro-inflammatory cytokines were present in SJIA cases. The second part is that the HPV vaccine can cause a reduction or an increase in cytokines, pro-inflammatory cytokines. So our position in this case is that the petitioner's evidence doesn't connect those two parts, number one. And number two, it doesn't show how even if that theory were to be somehow or another applicable or doable, how it applies to the facts in Vanessa's case. You know, part of what bothers me about this PRONG1 analysis is that, you know, the government's always the first one to come in here and say, well, they relied upon weak evidence or they relied upon things that were not supportable. And yet it seems to me that the special master in going so far out of his way to fight against this claimant on PRONG1 relied upon a lot of ridiculous stuff, like articles that conceitedly had sample sizes that wouldn't give you any kind of statistically significant result, and things that were completely irrelevant to the analysis. So I just have a real hard time with the special master's – the evidence that the special master found to be contradictory to the claimant's claim. Your Honor, the special master didn't exclude any evidence. He considered everything that was submitted to him by the parties. He went through the evidence in quite a lot of detail in this 57-page decision. He went through the analysis under Alton PRONG1 using Daubert, which he's allowed to do. He considered three of the four Daubert parts of the Daubert test – one didn't apply because no one presented any evidence on that – to analyze whether the evidence that was presented by the parties, or particularly a petitioner in this case because they're trying to prove the theory, was reliable and persuasive. You know, he looked at everything that was submitted. The only thing he went really beyond what was submitted was he, before the hearing, requested that two additional articles or several additional articles, two of which he talked about in his decision, be filed by a petitioner. They were actually articles that were cited in an article that was relied on by Dr. McKay. I appreciate all the articles and evidence that was cited by the special master, but the problem I have is that just where the PRONG1 is an appropriate test in a situation such as this where we have a condition that is exceedingly rare, on A4 of the record it says it shows that the annual incident rate of this disease in children less than 16 years of age is between 0.3 and 0.8 out of every 100,000 people or children. And it seems to me just to build any type of viable statistical analysis of this would involve hundreds and hundreds of thousands of individuals, something that we don't have. In fact, the statistics are so small, the population, that it's clear why there's little study in the literature on this. So are we really applying the PRONG in a way that's essentially going to preclude a finding of causation in this case? Your Honor, two responses to that. Number one, there was some statistical evidence in terms of the CHOW article, which was submitted by Petitioner and then by also Dr. Rose in his review of the case. It had almost, I think, 200,000, upwards of 189,000, I think, was the number of cases reviewed through, I think, the Kaiser system in California that looked at whether or not there was any... It didn't look specifically at SJIA, but it looked at juvenile rheumatoid arthritis. The CHOW article was the one with a really small sample size. Well, it's like how do you define small? I know in epidemiology you need big numbers, but it's the best evidence we have at this point in time. I think it was 189,000. It's the kind of thing that I've seen special masters in these cases, especially this special master, throw out over and over and over again because it's not statistically significant. And then he somehow tries to say that because the second one was double, so double almost nothing is still almost nothing, and he says because it's double it must have been statistically significant. It doesn't even make sense. I'm not sure what you're talking about when he doubled. Well, he said because their STRAITEN article talked about a sample size that was about twice what CHOW was, but somehow that made it really important, even though if you double almost nothing, you still have almost nothing. And I think he talked about for STRAITEN and the fact that it wasn't quite the same as this case because for STRAITEN dealt with a different strain of vaccine, and it was a little bit different. And that was cited by Dr. Rose, our expert, but the CHOW article was cited by both sides in this case and was considered as part of the petitioner's case as well. Right, so for STRAITEN doesn't even deal with Gardasil, and yet he seems to find it extremely persuasive. Well, I don't know if it's extremely. He said in his decision it was one piece of the evidence. It wasn't as decisive in his mind one way or the other. Right, but those are the only two articles he discussed. So there's a whole series of other articles, but the only ones he seems to discuss are the ones that have sample sizes that are not very meaningful. Well, those are the only two epidemiological studies I think he's discussed. I think he discussed a lot more articles in terms of what was cited by petitioners as well as respondents regarding... Of course, the law doesn't require epidemiology, and that's bad epidemiology. So you've got two problems with him relying on those. Well, he used those as part of the overall process in terms of considering both Albert and both the evidence that was submitted. I don't think he relied solely on epidemiology here, and he even said that you can't require a petitioner to submit epidemiology, and he didn't in this case. It wasn't the only thing that he relied on. He also looked at other factors under Daubert, including the fact that we talked about the Pinto article a little bit as well, and I can do that in a minute, but he also looked at peer review and whether the theory has been accepted in the scientific or medical community, and in this case it wasn't even discussed. But the entirety of his finding on that point was that Dr. Rhodes said, I've never heard about it. And so he said, well, if it was really well known, he would have had to hear about it. But going back to what Judge Raynor was saying, where we're talking about a condition that is so rare, and then obviously even an injury relating to that condition that would even be more rare, the fact that one practicing rheumatologist hasn't heard of it doesn't establish that it has no meaning. Well, getting back to the second point of Judge Raynor's question and also yours in terms of the rarity of it, we're not even talking about a situation where there are case reports on this, which would be really the first or the bottom line in terms of if a certain type of condition or injury pops up after vaccination, usually the first thing that comes to mind is practitioners file case reports. In this case, and at the time this case was tried, there were no case reports on this condition either. And I understand the epidemiology, and I know what you're saying, Your Honor, but you didn't rely specifically on epidemiology here. There's a reluctance between when people get the victims of a vaccine, and it's extremely rare, and they're advised by counsel, let's not pursue this, it's too rare, there's no literature out there. The rarity of this and the fact that Dr. McKay does show a theory, isn't that enough to fully support prong one, the plausibility of a theory? Well, you say plausibility. The evidence here needs to be met with a more likely than not standard on prong one. He states a theory, certainly. And then he also cites a great deal of literature to support it, including Pinto and other things. But the special master in his role as the fact finder looked through all the evidence, didn't exclude any evidence, considered everything and determined that in this case, at this point in time, while it's not impossible, he stated that it was not more likely than not. And I wanted to also get back to your point, Judge O'Malley, in terms of Dr. McKay. Dr. McKay was also asked, he's a PhD immunologist, whether or not in the immunological community, whether this is something that's been discussed among his peers. And he also said it wasn't something that was discussed among his peers. So the special master, in his review of the case, considered what the testimony was from both of the experts in terms of one of the Dalbert factors that was considered here as well. Can I move you on to the temporal relationship, please? Yes. Can you tell me why they failed to meet the temporal relationship with the onset of symptoms about two, two and a half months? In this case, as Dr. Rose explained, give a little bit of background about how cytokines work and how they react. It's something that would happen immediately. Dr. Rose testified that if Vanessa would have had a very quick reaction, a fever, joint pain, systemic type of injuries, a rash within hours or days of the vaccinations that we're talking about here, then it would make sense. But in terms of cytokines, there's no indication that there was any type of ongoing elevation of cytokines to the point in time where she became systemic either two or four months later after the vaccination. From Dr. Rose's standpoint, he testified to this, it really doesn't make medical sense that this is how cytokines will react. Number one. Number two, we don't really know. I mean, we know cytokines are present in SJI patients and we know that cytokines are elevated when a person receives HPV vaccine, but we don't know if, as I think Judge Beruking said, whether they're a cause and effect or, in his argument I think he said, whether they're at the scene of the crime or not. So we don't know whether or not this elevation in cytokines that's seen in SJI patients has anything to do with its cause. Is there any evidence that rules out the application over two to four months? Well, the evidence here in terms of rules out, well, it's not a burden to rule out something, but our position is based upon the testimony of Dr. Rose and the evidence that we submitted that two to four months is too long. The actual article, the Pinto article, was something that the Special Master also discussed in terms of Alt and PROM3 and looking at the media portion of that that was discussed by Ms. O'Dell, that in the Pinto article it was Dr. Rose's view that actually the vaccinated group of the 24 women who were four that received a placebo, 20 that received vaccination, and then they did the testing over a series of time. The media group from that vaccinated group who didn't receive the stimulation would be most likely an SCA here, and in that case there was no increase in elevation of cytokines over the time period that they tested. I think they tested up to seven months, and that really was the basis, I think, for Dr. McCabe's testimony about the timing of seven months being appropriate. There was really nothing to support what he was talking about in terms of amplification. He was questioned, Dr. McCabe, at the hearing about where is the evidence to support some type of amplification because Vanessa didn't have these symptoms immediately after vaccination, and there was really no elevation until many months after she got the second vaccination. How does the claimant deal with the fact that even though there are certain tests that could be taken to determine whether amplification was occurring, because of the nature of our health care process, those tests are not going to be given in a clinical setting, so you almost never could prove it? Well, I mean, people go to the doctor because they have symptoms, and that's the first, I mean, you go to the doctor. But that hurts you, right? That doesn't help you answer her question. It hurts you because there's no reason that this particular petitioner would have gone to the doctor to have the cytokines tested until she had the symptoms. So we have no idea whether there was a gradual amplification until the symptoms occurred. Well, that's what I was going to say. If she would have been to the doctor to get a physic or something like that after maybe the first month after the vaccination, somehow or another picked up in her blood, hey, there's an amplification here, or she had some of the blood testing that is relevant to systemic JIA and rheumatological conditions. Maybe then you think, well, there's an elevation here, and the vaccination may not be symptomatic, but there's an elevation here we need to look at. But it didn't happen here. And as Dr. McCabe testified, it virtually never would happen because it's not the kind of thing that's done in a clinical setting. They just don't order those kinds of tests. But it could be. I mean, if you're going to try to prove a theory or at least test a theory like Dr. McCabe's theory, that could be done. Right, but you don't know the theory until after you already have the symptoms, so it's too late to do it. But is there argument that there is nothing in the medical literature anywhere that would support the notion that amplification could otherwise be occurring? There's nothing in the medical literature that was submitted in this case that supports amplification could be occurring in general or specifically in Vanessa's case. So your argument is that they don't have anything specific to her, like tests that would have shown the amplification he's referring to, nor is it a reliable theory or plausible theory of what could have occurred? I guess, as the special master said, it's not necessarily possible, but there would be some evidence there to support amplification. But the amplification thing really came up at the time of the hearing and when we got into the issues of questioning Dr. McCabe about how Vanessa here could go two to four months without showing any signs or symptoms of SJIA, and then suddenly, boom, she has it. And how can we go back to the vaccination? First is what we know about SJIA, which is predominantly more of a genetic condition. People were speculating, and there's articles in the case here talking about, well, we think it might be infections, we think it might be vaccinations. We're looking at these different things, but no one has really pinpointed what environmental factor. Right, this is one of those diseases that we don't really know anything about. I mean, you're saying what we know about it. They don't know. They did guess that it's genetic, but there's all kinds of belief that it might have environmental factors as well. Oh, I think that there's a good basis to say that it's predominantly genetic. I think that there are environmental factors that do play a role. We're not certain what environmental factors do play a role, but I think that it is. So in this case, Vanessa was, we can say, genetically pre-disposed for this condition, but the only thing that we're lacking is a trigger. Well, it could have been the vaccine. It could have been the sunburn she got at the beach that summer. It could have been a bee sting. It could have been the vaccine. Right, but none of the other things happened, and there's no proof that the trigger was something else other than the vaccine in this record. Well, we don't know if those other things didn't happen. In terms of a trigger, there could be. Well, she's exposed to the same environmental climates as everybody else. She's exposed to sunlight. She's exposed to milk. She's exposed to everything. There's nothing in the record that shows that any of those other environmental matters triggered the condition. And in our position, there's really no reliable persuasive evidence to record to show that it was the vaccine in this case either, so. Okay. Thank you, Mr. Whisker. Ms. O'Dell. Give her two minutes. Thank you, Your Honor. I would just, to follow up on your question, Judge Rayna, that is exactly our position, that Vanessia was genetically predisposed, that the Pratt & Arnall article supports a finding that vaccines can be a trigger, that the Gardasil vaccine was a trigger, that in Vanessia's case caused her adaptive and innate immune systems to become dysregulated. In other words, to get out of balance like a normal individual would after vaccination with Gardasil. And as a result, she had dysregulation that was perpetual post-vaccination, and that's what resulted in her development of the SJIA. So in terms of some other points that were raised by respondent, let me just focus for a moment on the epidemiological evidence that was really required by the special master and follow up on your comment about the specific studies. Verstraten, as the court pointed out, did not deal with the Gardasil vaccine. Chow did involve Gardasil, but it was woefully underpowered to have any relevancy to the increased rate or a increased rate of SJIA. And for those reasons and for the emphasis the court placed on those, we believe that they raised the burden of proof that was required by Petitioner and as a result erred. And that finding deserves no deference by this court. Let me go on to talk just a little bit more about temporal association and just a few seconds I have left to say that the vaccination regimen of seven months is purposeful because that time period is the time period during which their vaccinated individuals reach immunogenicity or seroconvert. And as a result of that, that is the relevant time period. Vanessia manifested symptoms during that time period, and we believe that is preponderant evidence of a temporal association. Thank you very much. Thank you both counsel for their arguments. The case is taken under submission. Let's start proceeding. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock. Thank you.